No. 25-1224
(consolidated with 25-1215)

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRCT OF COLUMBIA CIRCUIT

---

MARTIN LUTHER KING, JR. COUNTY,

Petitioner,

v.

SEAN DUFFY IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE U.S. DEPARTMENT OF TRANSPORTATION; THE U.S.
DEPARTMENT OF TRANSPORTATION; THE FEDERAL MOTOR
CARRIER SAFETY ADMINISTRATION; THE UNITED STATES

Respondents.

---

**On Petition for Review of an Interim Final Rule of the Federal
Motor Carrier Safety Administration**

---

**REPLY IN SUPPORT OF MOTION FOR STAY PENDING
JUDICIAL REVIEW**

---

Paul J. Lawrence
Kevin J. Kennedy
Eugene Lee
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
(206) 240-1700

*Counsel for Petitioner*

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 1

ARGUMENT ............................................................................................ 2

I.   Petitioner Is Likely To Succeed On The Merits. ............................ 2

   A.   The IFR exceeds FMCSA's statutory authority. .......................... 2

   B.   The IFR is Arbitrary and Capricious. .......................................... 4

      1. The IFR does not reflect reasoned decision-making. .............. 4

      2. The IFR is based on a pretextual explanation ........................ 7

   C.   The IFR was improperly issued without APA notice and
   comment. .................................................................................. 8

   D.   The IFR was improperly issued without "consultation" with the
   States. ...................................................................................... 10

II.  Petitioner Satisfies the Remaining Stay Factors .......................... 12

III. The Proper Relief is To Preserve the Status Quo Pending Review
   .................................................................................................. 13

CONCLUSION ...................................................................................... 14

# TABLE OF AUTHORITIES

## Federal Cases

*Action on Smoking & Health v. CAB,*
    713 F.2d 795 (D.C. Cir. 1983) ............................................................... 14

*Allina Health Servs. v. Sebelius,*
    746 F.3d 1102 (D.C. Cir. 2014) ............................................................. 13

*Davis Cnty. Solid Waste Mgmt. v. EPA,*
    108 F.3d 1454 (D.C. Cir. 1997) ............................................................. 14

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ................................................................................. 8

*Graphic Commc'ns Int'l Union, Loc. 554 v. Salem-Gravure Div. of World
    Color Press, Inc.,*
    843 F.2d 1490 (D.C. Cir. 1988) ............................................................... 5

*Magnetsafety.org v. Consumer Prod. Safety Comm'n,*
    129 F.4th 1253 (10th Cir. 2025) ............................................................. 6

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) ................................................................................. 11

*Tozzi v. U.S. Dep't of Health & Hum. Servs.,*
    271 F.3d 301 (D.C. Cir. 2001) ................................................................. 8

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) .......................................................................... 13, 14

*United Scenic Artists, Loc. 829, Bhd. of Painters & Allied Trades, AFL-
    CIO v. NLRB.,*
    762 F.2d 1027 (D.C. Cir. 1985) ........................................................... 3, 4

*United States v. Stanchich,*
    550 F.2d 1294 (2d Cir. 1977) ................................................................. 8

## Federal Statutes

5 U.S.C. § 705 ........................................................................................ 14

5 U.S.C. § 706(2)................................................................13

28 U.S.C § 2349(b)............................................................14

49 U.S.C. § 31305.......................................................10, 11

49 U.S.C. § 31305(a)......................................................3, 10

49 U.S.C. § 31308..........................................................3, 10

49 U.S.C. § 31311(a)(6).........................................................3

49 U.S.C. § 31311(a)(12)(A)...................................................11

Section 31308(1)(A) .............................................................10

## Federal Regulations

49 C.F.R. § 383.73(b)(3)(iv) ...................................................3

*Commercial Driver's License Testing and Commercial Learner's Permit Standards*,
76 Fed. Reg. 26854 (May 9, 2011) ..................................10, 11

*Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination*,
86 Fed. Reg. 61555-01...........................................................9

90 Fed. Reg. 46509 (Sept. 29, 2025)...................2,4,5,6,7,11,12

## INTRODUCTION

Respondents claim the Interim Final Rule (IFR) furthers safety concerns. But there is a lack of credible evidence of safety benefits from debarring almost 200,000 trained and experienced Commercial Driver's License (CDL) holders because of their immigration status or the ability of States to access driving histories.  This Court should stay the IFR because (1) this lack of credible evidence renders the IFR arbitrary and capricious; (2) the IFR exceeds Respondents' authorization to regulate only requirements that assure the fitness and training of CDL applicants; and (3) the IFR is procedurally flawed because Respondents' failed to engage in notice and comment without good cause or to consult with the States as required by statute.

Instead of safety, this is a rule about removing nearly all documented immigrants from our roads.  DOT Press Conference by Sec. Duffy, Oct. 30, 2025 at 2:08-2:45[1] (CDLs were originally "envisioned" only for U.S. Citizens).  The IFR is just a pretext to further the administration's immigrant policy and informed by a belief that only

---

[1] Available at https://www.youtube.com/watch?v=lxTuvQvJrlk&t=38s

U.S. Citizens should drive trucks in America. *See id.* at 19:14–21:33. That is not a valid legal basis for adoption of the IFR.

Accordingly, considering the harm that will be caused without an emergency stay of the IFR, Petitioner's motion for such a stay should be granted.

## ARGUMENT

## I.    Petitioner Is Likely To Succeed On The Merits.

### A.    The IFR exceeds FMCSA's statutory authority.

The IFR's *only* change to the qualifications for issuing non-domiciled CDLs is to exclude certain noncitizens from obtaining CDLs. FMCSA acknowledges that it possessed no evidence demonstrating a relationship between these noncitizens and safety outcomes. 90 Fed. Reg. 46509, 46520 (Sept. 29, 2025). And the parties agree that FMCSA's authority is limited to regulating safety. Accordingly, there should be no dispute that the IFR exceeds FMCSA's authority.

Rather than challenge this conclusion, Respondents contend that because FMCSA has the authority to require States issuing CDLs to obtain driving records from other States, they must also have authority to do something entirely different—exclude nearly all noncitizens from

2

CDL eligibility—simply because immigration status is tangentially related to the accessibility of driving histories. Not so.

Congress did not give FMCSA authority to do anything bearing remote relation to driving records. It requires States obtain the applicants' driving histories' from other States (not foreign governments) before issuing CDLs, 49 U.S.C. § 31311(a)(6), and gave FMCSA the authority to issue regulations concerning State *procedures* for issuing CDLs under 49 U.S.C. § 31308, including the driver-history requirement. 49 C.F.R. § 383.73(b)(3)(iv) (implementing a driving history requirement under subsection "State procedures"). It also gave FMCSA cabined authority to ensure applicant fitness. *King County* Mot. 14–15 (discussing 49 U.S.C. § 31305(a)).

Prohibiting entire categories of people from obtaining CDLs is not a State procedure or an authorized fitness regulation. Even if FMCSA could regulate based on driving histories, Respondents go astray arguing the agency can create an irrebuttable presumption that certain persons will be unable to produce credible driving histories. Resp. 16. "[A]n agency is not free to ignore statutory language by creating a presumption on grounds of policy to avoid the necessity for finding that

3

which the legislature requires to be found." *United Scenic Artists, Loc. 829, Bhd. of Painters & Allied Trades, AFL-CIO v. NLRB.*, 762 F.2d 1027, 1034 (D.C. Cir. 1985). The creation of such a presumption "is beyond the [agency's] statutory authority." *Id.* at 1035.

## B.    The IFR is Arbitrary and Capricious.

### 1.    The IFR does not reflect reasoned decision-making.

Regardless, FMCSA's unreasoned overreach is arbitrary and capricious. Just as FMCSA lacked evidence supporting a relationship between immigrant status and driver safety—which Respondents concede, Resp. 11—it furnished no evidence supporting a relationship between immigrant status, access to driver history, and ultimately to driver safety. No such evidence exists.

The linchpin of the IFR's justification is that H-2A, H-2B, and E-2 visa holders, unlike all other noncitizens, are routinely screened for clean driving histories by their future employers. But the IFR provides no data—nor estimate—of how frequently these employers actually do this. Nothing in those visa processes *require* an employer obtain any information about an applicant's driving history. FMCSA instead relies on a single "consult[ation]" indicating that employers sponsoring those

4

visas "typically" look for "some combination" of job requirements, one of which is a "clean driving record." 90 Fed. Reg. at 46516. "[C]onjecture," however, "cannot substitute for a reasoned explanation." *Graphic Commc'ns Int'l Union, Loc. 554 v. Salem-Gravure Div. of World Color Press, Inc.*, 843 F.2d 1490, 1494 (D.C. Cir. 1988).

One need not look far to see conjecture is all that exists. E-2 visas are not based on an employment offer but on the applicant's substantial investment in a domestic business.[2] And the "consulting" agency has nothing to do with issuance of E-2 visas. Thus, the IFR does not mention employers as to E-2 visa holders. 90 Fed. Reg. 46519. Moreover, many DACA recipients and asylum seekers have lived in the United States for longer periods of time than those with H-2A, H-2B, or E-2 visas. An amicus brief identifies noncitizens who are now ineligible for CDLs despite having lived in the United States for well over a decade with clean driving histories. *Asylum Seeker Advocacy Project & National Employment Law Project* Br. 8–9. And another amicus brief explains how Sikh asylum seekers remain in the United States for

---

[2] *E-2 Treaty Investors*, U.S. CITIZENSHIP & IMMIGR. SERVS., https://www.uscis.gov/working-in-the-united-states/temporary-workers/e-2-treaty-investors.

years while their asylum applications are pending, during which they work as truck drivers. *Sikh Coalition et al.* Br. 8.

Respondents still claim it was reasonable for the agency to conclude that, as a "class," visa employers have a greater incentive to screen driving histories than employers of other noncitizens. Resp. 13. But the agency itself made no such comparative assessment, unlike in the case highlighted by Respondents. *See Magnetsafety.org v. Consumer Prod. Safety Comm'n*, 129 F.4th 1253, 1265 (10th Cir. 2025) (noting agency's explanation). Nor is the class-wide conclusion justified. In the "lengthy job order process" that supposedly incentivizes vetting, applicants must list job qualifications and requirements consistent with those "imposed *by non-H–2B employers* in the same occupation and area of intended employment." 90 Fed. Reg. at 46516 & n.25 (emphasis added). In other words, visa employers must approximate the vetting done by non-visa employers to complete the job order process.

FMCSA's failure to consider a straightforward rule that requires noncitizens to furnish driving records to States directly underscores the lack of reasoned decision-making. Respondents say that that this alternative is not "obvious" because States cannot adequately assess

foreign driving histories. Resp. 15. But they do not explain why this task is beyond States' capacities. FMCSA can directly regulate SDLAs and their processes and withhold federal funds where processes are not followed. And nothing in its recent audit suggests that they will not abide by regulations requiring review of driving histories. 90 Fed. Reg. 46512.

### 2.    The IFR is based on a pretextual explanation

Days ago, the Department of Homeland Security announced it worked with the Indiana State police to arrest 146 truck drivers, emphasizing "sanctuary states around the country have been issuing illegal aliens commercial driver's licenses."[3] This again demonstrates the true purpose of the IFR is to expand immigration enforcement. *King County* Mot. 21–24. Rather than confront this argument on the merits, Respondents assert that the Court must ignore public statements and that FMCSA's justification is sincere because the IFR enhances road

---

[3] *Secretary Noem Highlights More than 140 Illegal Alien Truck Drivers Arrested During Operation Midway Blitz*, DHS (Oct. 30, 2025), https://www.dhs.gov/news/2025/10/30/secretary-noem-highlights-more-140-illegal-alien-truck-drivers-arrested-during.

safety by excluding noncitizens whose foreign driving histories are not routinely vetted. Neither assertion is persuasive.

Excluding public statements from APA review impermissibly requires courts "to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)). And consideration of such public statements does not unduly intrude into the workings of the Executive Branch. *Id.* at 780–81. Thus, this circuit, like others, considers public statements in reviewing agency action. *See, e.g.*, *Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 312 (D.C. Cir. 2001). And contrary to Respondents' contention, the IFR is, for reasons discussed supra pp. 4-7 anything but "precise" in addressing road safety. Resp. 17. The serious "disconnect between *the decision made* and the explanation given," *Dep't of Com.*, 588 U.S. at 785 (emphasis added), indicates that FMCSA's justification for it is pretextual.

## C. The IFR was improperly issued without APA notice and comment.

Respondents argue they satisfy the APA's good-cause exception, analogizing the situation here to an emergency on the scale of the

COVID-19 pandemic and relying on a case involving the 9/11 terrorist attacks. The comparisons are patently inapt. COVID-19 and the lack of vaccination among hospital staff was a bona fide emergency involving "1,900 deaths among health care staff" over a short period of time. *Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination*, 86 Fed. Reg. 61555-01, 61585. And it was equally evident that the regulatory change would dramatically reduce infections, hospitalizations, and deaths from COVID-19. *Id.* Similarly, there was a clear and urgent need for air-safety regulations in the wake of the unprecedented 9/11 terrorist attacks.

In contrast, the claimed emergency is five crashes out of 6,000 annually. *King County* Mot. 10. Respondents do not dispute that FMCSA had no evidence that crashes were at or above historical levels. Rather, they suggest any number of injuries or deaths—no matter the size of the industry or the timing of the injuries—suffices. Resp. 20. But no authority supports that position. And there is no need to establish a "particular quantitative threshold," Resp. 20, because the IFR acknowledges that FMCSA cannot predict any quantitative impact on safety.

Nor can Respondents rehabilitate the IFR's procedural flaws based on a predicted "surge" of CDL applications. Resp. 19 n.2. Respondents admit FMCSA's data here is "imperfect." But FMCSA's data is worse than imperfect: it does not show a spike in applications. It simply shows rising applications, without any context to demonstrate (or even indicate) they accelerated following the announcement of the application window or dissipated after the window closed.

### D. The IFR was improperly issued without "consultation" with the States.

FMCSA's failure to consult the States prior to issuing the IFR cannot be squared with the statute's language, the IFR itself, or the agency's past practice.

Respondents wrongly contend the consultation requirement in 49 U.S.C. § 31308 does not apply because the FMCSA names a different section, 49 U.S.C. § 31305, as the basis for the IFR. But these sections work together. Section 31308(1)(A) provides, "After consultation with the States, the Secretary of Transportation shall prescribe regulations on minimum uniform standards for the issuance of [CDLs]" that ensure that CDL applicants pass driving tests meeting the requirements that the Secretary sets "under section 31305(a)." Indeed, FMCSA typically

invokes both Sections 31305 and 31308 in promulgating similar regulations. *See Commercial Driver's License Testing and Commercial Learner's Permit Standards*, 76 Fed. Reg. 26854, 26855 (May 9, 2011).[4] That rulemaking underwent prior notice-and-comment in which States participated. *Id.* at 26857.

Indeed, the IFR recognizes the two provisions' interrelation, stating that the Commercial Motor Vehicle Safety Act requires the Secretary to consult the States before issuing regulations under Section 31305(a), 90 Fed. Reg. at 46511, and acknowledging it did not abide by this requirement because it was "not practicable." *Id.* at 46523. The consultation requirement includes no good-cause exception and, in any event, Respondents cannot offer an explanation different than the one provided by the agency as to why FMCSA failed to consult. *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943).

---

[4] Respondents claim this rule, which created the category of non-domiciled CDLs was issued pursuant to 49 U.S.C. § 31311(a)(12)(A), Resp. 3, but the rule never mentions that provision, instead referring only to Sections 31305 and 31308.

## II.    Petitioner Satisfies the Remaining Stay Factors

Without a stay, Petitioner will suffer irreparable harm. In addition to King County Metro immediately losing four trainee and five current bus drivers, it will begin to lose the $675,000 it spent training its remaining 45 bus drivers who are ineligible to renew their licenses under the IFR. Eldred Declaration ¶¶ 25, 29. Contrary to Respondents' contention, these 45 drivers face imminent expiration of their CDLs because their CDLs expire either the day that their Form I-94/I-94A expires or within a year—whichever is sooner. 90 Fed. Reg. at 46511. Respondents also speculate these bus drivers can continue employment during this litigation. But when a driver loses their CDL, "they cannot perform their job and will be terminated." Eldred Declaration ¶ 18.

The balance of the equities and public interest factors also weigh in Petitioner's favor. Under the IFR, 194,000 current non-domiciled CDL holders are at risk of losing the means of supporting themselves and their families. 90 Fed. Reg. at 46519. And local governments across the nation will not only lose experienced drivers but also subject the public to the inevitable safety risks of putting many inexperienced drivers on the roads. Respondents speculate these drivers can find new

jobs and their harms "pale in comparison to those the government has identified." Resp. 22. But what are these harms? Respondents rehash their merits discussion, in which they acknowledge that the IFR addresses speculative, rather than concrete, road safety concerns based on the vetting of driving records and avoiding a surge in non-domiciled CDL applications. These abstract harms cannot outweigh the IFR's immediate disruption of drivers' livelihoods and their employers' ability to provide services in a manner that serves the public interest.

## III. The Proper Relief is To Preserve the Status Quo Pending Review

If the Court finds Petitioner is entitled to interim relief, the proper relief on Petitioner's APA claims is a suspension of the IFR's legal effect pending the Court's review.

Respondents contend that any relief must be limited to the individual parties, but that is not the law when it comes to APA claims. *See Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025). The APA instructs courts to "set aside"—*i.e.*, vacate—actions they find to be unlawful. 5 U.S.C. § 706(2); *see also Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). Section 705—entitled "Relief pending review"—provides that a reviewing court "may issue all

13

necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.[5] As Justice Kavanaugh explained, under the APA, "plaintiffs may ask a court to preliminarily 'set aside' a new agency rule." *CASA*, 606 U.S. at 869 (Kavanaugh, J., concurring). Thus, to the extent that Petitioner is entitled to interim relief, this Court should preserve the status quo and "reinstat[e] the rules previously in force" pending review. *Action on Smoking & Health v. CAB*, 713 F.2d 795, 797 (D.C. Cir. 1983).

The Court's relief, moreover, should cover the IFR in its entirety. Many of the provisions are interrelated and there is "substantial doubt" that FMCSA would have promulgated the other provisions absent the eligibility changes which serve as its backbone. *Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997).

## CONCLUSION

The Court should stay the IFR pending a determination of the merits.

---

[5] The source of jurisdiction—the Hobbs Act—does not affect the remedies available under the APA. Nonetheless, it authorizes the same remedies. 28 U.S.C § 2349(b).

Respectfully submitted,

Paul J. Lawrence
Kevin J. Kennedy
Eugene Lee
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
(206) 240-1700

November 3, 2025

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(C) because it contains 2,600 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

/s/ Kevin J. Kennedy
Kevin J. Kennedy

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2025, I electronically filed this motion with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Kevin J. Kennedy
Kevin J. Kennedy